UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| LAYNE WINTERS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:17-cv-04053-SLD-JEH |
| ) | |
| AT&T MOBILITY SERVICES, LLC, ) | |
| ) | |
| Defendant. ) | |
| ) | |

ORDER

Before the Court is Defendant AT&T Mobility Services, LLC's ("AT&T") motion to compel arbitration, ECF No. 7; and its motion for leave to file a reply to Plaintiff's response thereto, ECF No. 12. For the following reasons, the motion to compel arbitration is GRANTED, and the motion for leave to file is DENIED.

BACKGROUND

On January 13, 2017, Plaintiff Layne Winters filed a complaint in Illinois circuit court alleging that she had been wrongfully disciplined and terminated from her job as an assistant store manager at an AT&T store in Moline, Illinois. Compl. 2–3, Not. Removal Ex. A, ECF No. 1-1. She alleged (I) discrimination on the basis of sex in violation of the Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e–17, Compl. 3–4; (II) discrimination on the basis of gender under the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/2-101–5/2-106, Compl. 4–5; (III) discrimination on the basis of a disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12117, Compl. 5–6; (IV) discrimination on the basis of a disability in violation of the IHRA, Compl. 6; (V), (VI) retaliation under Title VII and the IHRA respectively, Compl. 6–7; and (VII) interference with exercise of rights

1

guaranteed by the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601–2654, Compl. 8–9. AT&T timely removed the action to this Court on February 14, 2017, under the Court's federal-question and removal jurisdiction, 28 U.S.C. §§ 1331, 1446. On March 23, 2017, AT&T filed the motion to compel arbitration.

## DISCUSSION

**I.     Legal Standard on a Motion to Compel Arbitration**

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–307, governs federal courts' treatment of litigants' arbitration agreements, and reads, as relevant here:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3. "The FAA is Congress's manifestation of a national policy favoring arbitration and results in the placement of arbitration agreements on equal footing with all other contracts." *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 466 F.3d 577, 580 (7th Cir. 2006); *see AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). "Whether or not [a] company [is] bound to arbitrate, as well as what issues it must arbitrate, is a matter to be determined by the court on the basis of the contract entered into by the parties." *AT & T Tech., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986). "Under the [FAA], arbitration may be compelled if the following three elements are shown: a written agreement to arbitrate, a dispute within the scope of the arbitration agreement, and a refusal to arbitrate." *Zurich Am. Ins. Co. v. Watts Indus.*, 417 F.3d 682, 687 (7th Cir. 2005).

The FAA does not mandate an evidentiary burden that a party seeking to compel or avoid arbitration must meet, but "courts have analogized the standard to that required of a party opposing summary judgment under Rule 56 . . . . [in that] 'the opposing party must demonstrate that a genuine issue of material fact warranting a trial exists.'" *Taylor v. Tree*, No. 3:16-CV-2-TLS, 2016 WL 6523442, at *1 (N.D. Ind. Nov. 3, 2016) (quoting *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002)). "Just as in summary judgment proceedings, a party cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitration rests; the party must identify specific evidence in the record demonstrating a material factual dispute for trial." *Tinder*, 305 F.3d at 735.

**II.     Discussion**

Citing a long line of similar cases in which district courts have granted its motions to compel arbitration, Mem. Supp. Mot. Arb. 1–2, ECF No. 8, AT&T argues that this case is no different: Winters received a link to a boilerplate contract of adhesion from AT&T in her work email account, and, after viewing the agreement, did not "opt out" of the agreement in the time the document granted its adherents to do so, *id.* at 3–4. The contract was enforceable; it should be enforced; it demands that Winters's claims be arbitrated, and her case here stayed. *Id.* at 6–11. For her part, Winters claims that she never received the contract by email, Resp. 4, ECF No. 11, and contests the sufficiency of AT&T's proffered evidence to the contrary, *id.* at 4.

As elsewhere, so here—AT&T must prevail, and the case must be stayed pending arbitration. The reasons lie in a straightforward application of the law of contracts.

The contract in question does not state what law governs. Illinois choice of law rules, which this court applies since it sits in the Central District of Illinois, dictate that under such circumstances, Illinois contract law applies. *See Midwest Grain Prods. of Ill., Inc. v.*

3

*Productization, Inc. & Cmi Corp.*, 228 F.3d 784, 787 (7th Cir. 2000) (federal district court applies the choice of law rule for the state in which it sits); *McIntosh v. Magna Sys., Inc.*, 539 F. Supp. 1185, 1188 (N.D. Ill. 1982) (general rule in Illinois is that the law of the place of a contract's execution governs the contract). In Illinois, whether parties have entered into a contract depends on whether they have sufficiently manifested their intent to be bound by its terms:

> A valid and enforceable contract requires a manifestation of agreement or mutual assent by the parties to its terms, and the failure of the parties to agree upon or even discuss an essential term of a contract may indicate that the mutual assent required to make or modify a contract is lacking.

*Burkhart v. Wolf Motors of Naperville, Inc. ex rel. Toyota of Naperville*, 61 N.E.3d 1155, 1159 (Ill. App. Ct. 2016). The inquiry into intent is objective, concerned not with what the parties privately may have thought or known, but with what may fairly be ascribed to them on the basis of their words and actions. *Szafranski v. Dunston*, 34 N.E.3d 1132, 1150 (Ill. App. Ct. 2015); *Bank Computer Network Corp. v. Cont'l Ill. Nat. Bank & Trust Co. of Chicago*, 442 N.E.2d 586, 591 (Ill. App. Ct. 1982). Correlatively, the parties need not "share the same subjective understanding as to the terms of the contract." *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 515 N.E.2d 61, 65 (Ill. 1987).

The contract in question is unambiguous, and neither party contends otherwise. It provides that the AT&T employee viewing the contract and AT&T "agree that any dispute to which this Agreement applies will be decided by final and binding arbitration instead of court litigation [sic]." Contract 1, Dunlap Decl. Ex. 3, Mem. Supp. Mot. Arb. Ex. B, ECF No. 8-2. Somewhat circularly, the contract defines "disputes to which this Agreement applies" as those "that otherwise would be resolved in a court." *Id.* at 2. Winters does not dispute that her claims before this Court fall within the ambit of the contract and must, if she entered into the contract,

4

be submitted to arbitration; rather, she contends that she did not enter into the contract at all, or anyway cannot be sufficiently shown to have done so.

In summarizing Illinois contract law's treatment of online contracts, the Seventh Circuit has noted that "the law governing the formation of contracts on the Internet is still in the early stages of development. But there is no reason to think that Illinois's general contract principles do not apply." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016). Extrapolating from Illinois case law on cruise-ship tickets, *Walker v. Carnival Cruise Lines, Inc.*, 889 N.E.2d 687, 694 (Ill. App. Ct. 2008), the *Sgouros* court suggested that the appropriate inquiry for electronic contract formation in the consumer context is "whether the web pages presented to the consumer adequately communicate all the terms and conditions of the agreement, and whether the circumstances support the assumption that the purchaser receives reasonable notice of those terms." 817 F.3d at 1034. The court explained:

> This is a fact-intensive inquiry: we cannot presume that a person who clicks on a box that appears on a computer screen has notice of all contents not only of that page but of other content that requires further action (scrolling, following a link, etc.) Indeed, a person using the Internet may not realize that she is agreeing to a contract at all, whereas a reasonable person signing a physical contract will rarely be unaware of that fact. We need, therefore, to look more closely at both the law and the facts to see if a reasonable person in Sgouros's shoes would have realized that he was assenting to the Service Agreement when he clicked "I Accept & Continue to Step 3."

*Id.* at 1034–35. Although Winters's case does not, as did *Sgorous*, involve a consumer contract for purchase of goods online, the inquiry here is about an electronic contract, similarly concealed behind layers of electronic interface requiring user interaction, and is hence also fact-intensive, focusing on whether a reasonable person in Winters's shoes would have realized she was entering into a contract.

5

In support of its contention that Winters contracted for arbitration, AT&T offers a number of declarations from its employees, and copies of the documents in question. According to Jeremy Dunlap, an employee of Accenture, LLP, which contracts with AT&T to provide technical support for its computer systems, AT&T uses an application called Promenta to send emails to large groups of its employees. Dunlap Decl. 1. Dunlap reviewed Promenta's usage history and determined that the application sent out a mass email on March 19, 2015, with the subject heading "Action Required: Notice Regarding Arbitration Agreement." *Id.* at 2; Mar. 19, 2015 Email, Dunlap Decl. Ex. 1. He also found that one of these emails was sent to the address LW963C@us.att.com, *id.* at 3, which, AT&T's regional sales manager avers, was Winters's business email address, provided uniquely to her by AT&T. Wheeler Decl. 2, Mem. Supp. Mot. Arb. Ex. C, ECF No. 8-3. This email, which read "REVIEW REQUIRED" at the top, stated:

> AT&T has created an alternative process for resolving disputes between the company and employees. Under this process, employees and the company would use independent, third-party arbitration rather than courts or juries to resolve legal disputes. Arbitration is more informal than a lawsuit in court, and may be faster.
>
> The decision on whether or not to participate is yours to make. To help you make your decision, **it is very important for you to review the Management Arbitration Agreement linked to this email**. It provides important information on the process and the types of dispute that are covered by the Agreement.
>
> Again, the decision is entirely up to you. To give you time to consider your decision, the company has established a deadline of no later than 11:59 p.m. Central Standard Time on Monday, May 18, 2015 to opt out – that is, decline to participate in the arbitration process – using the instructions below.

Mar. 19, 2015 Email. The email then indicated that the linked document would itself contain a link permitting employees to opt out. A link at the bottom of the email led to the contract itself, in the form of an AT&T intranet page. Dunlap Decl. 3. The contract contains the same information about opting out, and a link to a site "where you can electronically register your decision to opt out." Contract 1. Dunlap indicates that AT&T's records also show that the

6

contract was accessed by someone logged into AT&T's system as "LW963C" on March 20, 2015. Dunlap Decl. 3–4. According to the Promenta records, the same person clicked the "Review Complete" button at the bottom on the contract on that date.

Winters does not dispute these records, or the user activity they show. Instead, she denies having ever received the email containing the link to the contract, Resp. 4, and argues based on her denial that "the only reasonable inference is that someone other than Winters used her password to access the email notice," *id.* Not so. To create a genuine dispute of fact as to whether she viewed the contract, Winters must point to some evidence in the record. *Tinder*, 305 F.3d at 735. Against AT&T's evidence, described above, showing the email containing the link to the contract was mailed to Winters's work address, and that someone using Winters's account viewed the contract and clicked a button indicating she had done so, Winters offers only her own affidavit, stating that she "do[es] not recall ever receiving any notification during [her] employment with [AT&T] regarding a Management Arbitration Agreement." Winters Decl., Resp. Ex. C, ECF No. 11-3. Winters suggests darkly that "AT&T used a keystroke logger to decipher log in [sic] and password information," *id.*, but does not provide any other evidence suggesting why someone at AT&T would have clandestinely logged into her account and, pretending to be her, viewed and clicked on the contract the day after it was mailed to her. This is pure conspiracy theorizing, and insufficient to withstand AT&T's well documented showing that Winters was emailed a description of the contract, clicked through a link that presented her with the contract, and finally clicked a button at the bottom of the contract indicating that she had read it, but never took the further step of "opting out" within the time granted to do so by the contract.

The more interesting question, which Winters does not raise but which the Court nonetheless considers, is whether a reasonable person in Winters's shoes would have understood, by taking the steps AT&T has shown she took, that she was entering into a contract. This contract has (at least) two unusual features as compared to conventional written contracts which are relevant to whether or not Winters made herself a party to it. First, it was made available online by AT&T for its employees to view, which they were invited to do via an email with a link to the document. Second, the contract does not immediately and affirmatively bind AT&T employees to arbitrate; rather, it signifies their consent thus to be bound if they do not "opt out" within a certain time.

Generally, under Illinois law, parties who sign written contracts are presumed to have notice of all of the contract's terms. *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 743 (7th Cir. 2010). When contracts are not written but displayed online, and signatories assent to them by clicking through, Illinois courts have found that a simple statement to the effect that terms and conditions apply to a sale, along with a link to those terms and conditions, is sufficient to incorporate those terms and conditions into a contract of sale entered into by completing a purchase. *Hubbert v. Dell Corp.*, 835 N.E.2d 113, 122 (Ill. App. Ct. 2005). Here, the facts all suggest that a person taking the actions Winters took would be on notice that she was agreeing to be bound to arbitration unless she opted out. The email that she received repeated this information with slight variations several times. When Winters clicked through to the contract itself, the contract again repeated in clear enough language that employees who did not wish to be bound by the arbitration agreement could opt out within a certain period. Finally, Winters clicked a button indicating that she had reviewed the document. Unlike *Hubbert* and *Sgorous*, the terms of the agreement were not squirreled away in a small scroll-down text field, or on an

8

entirely different document behind a hyperlink; they were contained in a document by themselves that Winters had to scroll through and click the bottom of to indicate having read (or at least, having scrolled through). Granting that Winters is being honest when she swears that she does not recall ever having done these things, it is no excuse that clicking on links in emails sent to her work address may have been routine parts of her job, to which she paid so little attention that she forget them. That is not a defense to contract formation.

So too, although the contract required signatories to "opt out" rather than, as is traditionally done with contracts, in, such a device is no impediment to the creation of a valid contract, even though it is plainly crafted to channel more employees into arbitration. *See Taylor*, 2016 WL 6523442 at *3 (holding that failing to opt out of an agreement to arbitrate between employer and employee was a manifestation of intent to accept the terms of the contract); *Johnson v. Harvest Mgmt. Sub TRS Corp.—Holiday Ret.*, No. 3:15-CV-26-RLY-WGH, 2015 WL 5692567, at *4 (S.D. Ind. Sept. 25, 2015) (same). Unfortunately for Winters, courts have consistently held that this very contractual language, as used by AT&T in identical employment relationships, is sufficient to create a situation where an employee, having read the contract, manifests assent by not opting out using AT&T's offered link. *See, e.g.*, *Uszak v. AT & T Mobility Servs. LLC*, 658 F. App'x 758, 763 (6th Cir. 2016) (holding that an AT&T employee who reads this contract and fails to opt out has demonstrated an intent to be bound); *Cornoyer v. AT&T Mobility Servs.*, LLC, No. CIV 15-0474 JB/WPL, 2016 WL 6404853, at *13 (D.N.M. Oct. 5, 2016) ("[W]hen, in accordance with the agreement's terms, [plaintiff] did not take action to opt out of the Management Arbitration Agreement by February 6, 2012, he manifested his acceptance."); *Couch v. AT & T Servs., Inc.*, No. 13-CV-2004 DRH GRB, 2014 WL 7424093, at *5–6 (E.D.N.Y. Dec. 31, 2014) (holding that employee who did not opt out of this contract had

9

manifested his assent). This case is the same. Winters has offered no evidence suggesting she attempted to "opt out," and in failing to do so, she manifested her intent to be bound by the terms of the arbitration agreement, which must be enforced.

## CONCLUSION

Accordingly, Defendant's motion to compel arbitration and stay proceedings, ECF No. 7, is GRANTED. Defendant's motion for leave to reply, ECF No. 12, is DENIED. This case is STAYED pending the resolution of arbitration proceedings; if Plaintiff wishes to pursue it, she must proceed to arbitration. The parties are directed to file a status update with the Court by January 10, 2018; in the absence of such an update, the Court may dismiss this matter without prejudice or further notice to the parties.

Entered this 10th day of July, 2017.

s/ Sara Darrow
SARA DARROW
UNITED STATES DISTRICT JUDGE
